The next matter, No. 24-1433, Che Blake Sosa v. Mass. DOC. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning, Your Honors. My name is Jeffrey Wiesner for Mr. Sosa, and I'm here with my co-counsel, Jennifer McKinnon. I would ask to reserve three minutes for rebuttal. You may. Beginning in 2009, Mr. Sosa spent 12 years in unique conditions of solitary confinement in a cell designed for short-term use that let in no natural light. By 2020, Mr. Sosa was so decompensated he was having auditory and visual hallucinations, and he was observed drinking his urine and eating his feces off of a styrofoam tray. A psychiatrist who was employed by the DOC testified at his deposition in this case that he believed Mr. Sosa's conditions of confinement were inhumane. Because Mr. Sosa was suicidal for a large period of time when he was confined in these conditions, an officer was stationed outside of his cell 24 hours a day just to prevent him from killing himself. His solitary conditions were further exacerbated by the DOC's handcuffing practice. It was a behind-the-back handcuff with a short chain, I think it was two links, and with his knuckles oriented toward one another. This required forcing Mr. Sosa's severely arthritic shoulder joints beyond their physiologic limits every time he left his cell. Because of this, Mr. Sosa refused to leave his cell for any reason, including for medical care or to take advantage of any opportunity he might have to go outside because he could not bear the pain of the cuffing. The Eighth Amendment prohibits cruel and unusual punishment. It has been understood since the Supreme Court decided Estelle v. Gamble in 1976 that the amendment prescribes more than barbarous punishments, but rather embodies idealistic concepts of dignity, civilized standards, humanity, and decency. I apologize. Counsel, let me just pose a question to you, if I might. I'm focusing now on the solitary confinement issue. Critical to that analysis is the so-called penological justification for the way in which the correctional officials have treated your client. I think by any measure it's fair to say that your client, given his violent history, which continued in prison, posed some pretty unique challenges security-wise. And respectfully, it seems to me you don't ignore, but you significantly minimize the difficulties that your client posed in terms of security within the institution. Those penological concerns are very relevant to the Eighth Amendment argument. Would you agree? Of course, Your Honor. And I think that to the extent that I may have minimized those, I don't think the district court particularly relied, as far as his decision, on the penological justifications. I think he mentioned it maybe in one sentence, at least with the cuffing, that the proper balance was struck. But mostly the district court relied on the idea that people didn't know about what was occurring or the deleterious effects that the conditions of confinement were having on Mr. Sosa. But I do think that there is a limit to, and it has to be, that there is a constitutional limit to how bad a situation can be and how much deprivation can be exacted. So from a qualified immunity perspective, I follow what you just said, and it has some appeal to me. It seems challenging from a qualified immunity perspective when you have to say that this particular action, based on these specific facts, violated clearly established law to pinpoint that dividing line between this defendant, who was particularly engaged in violent conduct that was very difficult to manage in a prison setting, on the one hand, with the use of segregated prison facilities, and the other, to achieve safety. There's a line. I follow that. But I wonder how, with precision, we can hold the officers to knowing where that line is. Well, I don't believe that the district court addressed qualified immunity in light of at least the well-established prong. He simply relied upon his conclusion that there was no violation of the Eighth Amendment and did not proceed to deal with the issue of whether it was well-established or not. I do think that that is a complicated issue to determine whether something is well-established. It's a legal issue. We can address that, even without the district court's analysis, can't we? I don't think so, Your Honor. I think that that is a mixed question of fact and law, the clearly established prong, and it would require factual findings before this court could address that and determine where the line needs to be drawn, without knowing what the constitutional violation is because it wasn't reached at the district court. I don't think this court should address that prong, and I have found a case which, of course, I can't quickly find the name of. Well, doesn't it also go to the subjective part of the Eighth Amendment? I mean, just take Rodriguez as an example. The superintendent has to make, I guess, a hard call. This person is decompensating in the ways you suggest, and there's no particularly good place to put him that adequately achieves safety based on the incidents that happen. And so that's a really, really difficult decision, I think, for a prison superintendent. And is he subjectively violating the Eighth Amendment when he has to make that balance? I think so, Your Honor. And I think that the most recent decision of this court in Cintron basically said that the critical thing was just how the inmate was deteriorating. I was going to say on Cintron, there seemed to be much more of a vindictive effort on the part of the prison officials to punish this person with no relation to valid penological considerations. Here we have the record of violence that they were trying to deal with, and it seems to me instead of making it impossible for the prisoner to get out of those confined conditions as in Cintron, here we seem to have a record of some self-sabotage, that he had a path out and he was choosing not to take that path. So I don't know that I see, unless you convince me otherwise, that Cintron really is on point. What do we do with the self-sabotage in this instance? Well, I do think Cintron is on point because it has to do with placing someone in conditions that cause their health to decline precipitously over the time that one is in solitary confinement. So I understand what you're saying, that there wasn't in that case the sort of penological justification that may be here. That seems really significant for purposes of the Eighth Amendment, because we're asking whether or not this lacks penological justification there. There was no justification here. The record seems to support one. Well, I'm not denying that there was justification for certain measures to deal with Mr. Sosa. I will say that the DOC's record on Mr. Sosa's violence really goes back to 2009, 2010, in that area, maybe 2012. Well, counsel, let me just read something to you, which I understand is from 2017. The point is that in some ways Mr. Sosa seemed to be his own worst enemy. He seemed to, either behaviorally or in things he said, seemed to sabotage his own requests for relief. In 2017, Mr. Sosa wrote to Rodriguez, I guess he's the superintendent of MCI, saying that if he were placed in a regular tier, I guess that would mean back in the prison population, he would, quote, plot, scheme, and wait patiently, and seek relief in bloody revenge by maiming or killing a male correctional officer. And then in a 2023 deposition, he said that I don't make the rules, I just break them. What are the correctional officials supposed to do in light of those kind of assertions, which again, don't go back to 2009 or 2010. They seem to be much current in terms of this litigation. Well, there's no doubt Mr. Sosa's bellicose, and he makes all sorts of threats. He has a very lengthy record of threats. That's not the same as committing violence. But I'm not in any way suggesting that Mr. Sosa should be on a normal tier. That's not the argument here. He needs to be controlled. There's no question about that. The issue is just how bad can the circumstances be. Is there any limit to how bad circumstances can be in a prison before the Eighth Amendment is implicated? If you do something to him and he, for whatever reason, says, you know, I'm going to take the pain that you're dishing out to me, is it still okay for prison officials to say, okay, you know, you can push the button any time you want to get out of this situation, but if he doesn't, he continues to be tortured in a prison. So that is the question here. The idea that he wasn't doing certain things, I would, you know, we've argued that he was basically out of his mind from the conditions he had been placed in. So I think that there is a limit. And I'd like to understand the conditions, because I want to make sure that I understand the record correctly. Did he have opportunity for exercise, access to reading, to visits, to phone calls? What is your view of the conditions? No. Everything was taken from his cell in the D wing. He didn't even have reading materials. If you go, we've cited the record to places that show that they had removed everything from his cell. They will say that that was because he was on mental health watch, that they had removed everything. But he didn't even have reading materials in his cell. He could not leave his cell because he couldn't withstand the pain of the cuffing. So his circumstances, I think, obviously are much worse than in the Cintron case. And I do think that the critical thing about Cintron is not the subjective animus toward that defendant. I mean, it plays a role, but the issue is just how badly the inmate is deteriorating mentally and physically in front of being witnessed by everyone at the institution. Counselor, just very quickly. So I understand the scope of the relief you were seeking. This case is now about damages only. There's no request for injunctive relief. Is that correct? That's not correct, Your Honor. Well, on that point, my understanding is that your client has been moved. I'm not going to get these initials right, from a DDU unit to another unit and another unit. And the unit in which he's now in is much less restrictive. I gather he has a window. He's got some reading material. He has some canteen privileges. So if that's true, why does that not, in effect, moot your claim for injunctive relief? And then in terms of the cuffing procedure, the department is already under an order to continue what they've been doing for a long time, to use these custom-made elongated cuffs. So there's nothing to order there. So why is injunctive relief even still part of this case? I misunderstood your question. Injunctive relief is not part of the solitary situation. Mr. Sosa is in a completely different situation now. He's doing much better. There's been no report of violence in years. With respect to the cuffing, as you know, we went before this court on the preliminary injunction because we challenged the court's determination that the elongated cuff that the district court decided was a sufficient accommodation. We challenged that, finding and sought further relief. This court determined on the deferential standard of preliminary relief that the district court had not made clear error. But we still seek a cuff and a chain length that does not manipulate Mr. Sosa's shoulders beyond their range of motion. That is where we are today. The elongated cuff, and the reason we appealed it, is simply not long enough to allow Mr. Sosa not to be placed in a condition of pain because his shoulders simply don't rotate far enough to allow the existing cuff to be one that doesn't cause him pain every single time he leaves the cell. And so that is the further relief that we are seeking. I would just say that this could have been made easier. In the transcripts that we put in the record before the district court, we had urged just let the expert who had been hired by the court through the DOC, just let him evaluate what the actual range of motion in Mr. Sosa's shoulders is. And the district court ordered that during the preliminary injunction proceedings. It never happened. And so it was never evaluated in any way but arbitrarily. So the DOC simply went ahead and ordered a chain that was about the length of two handcuffs strung together. And it's simply not sufficient, and our expert report makes it very clear. What are we to do with Mr. Sosa's apparent concession that it did relieve the pain? He said, just to be clear, he said that it relieved the extreme pain that the single cuff method or the knuckle-to-knuckle cuff method caused him. He also submitted an affidavit that it still causes him significant pain to be in that cuff because it continues to rotate his shoulders beyond the limits of their mobility. And I know that you've seen that I've pointed out in your opinion that there was a mistake in the physician assistant's report as to just how far his shoulders actually rotate, and that was used as a basis for the notion that he wasn't having his shoulders rotate. But, counsel, I understand your point, which is a fair one, but I thought we also made clear that it would be consistent with the Eighth Amendment even if he still has some residual pain because of the countervailing security concerns. I thought we were pretty clear in saying that some pain is acceptable within the Eighth Amendment framework. And that's true, and we don't deny that. The issue is just how much, and is there a factual issue in this case as to whether security could be achieved with a cuff that has a one-inch longer chain, a two-inch longer chain? We just don't know, and that's one of the many outstanding factual issues in this case that never got resolved because it was dismissed on summary judgment. There is a way to determine how long a chain has to be. It was available to us at the time of these proceedings to determine whether, and then the DOC could have evaluated it based on what it was actually, the actual length that was required, or it could have been modified somewhat. I mean, at this point, it's a chain that is still taking his arms behind the back, and our expert says that you need at least 90 degrees of internal rotation to take your hands behind your back to be cuffed, and he only has about 60, and everyone agrees to that. So they're rotating his shoulders 40, 50, 60 degrees beyond the limits of his physiology, and that seems to me to be a major problem. Counsel, just very quickly, as part of the preliminary injunction proceedings, there was evidence that any further elongation of the cuffs would compromise the security concerns of the institution, and they explained why, and they explained why they didn't want to continue with the waist chain procedure. And so I guess to use the language of the ADA, which I think is relevant here, this was a reasonable accommodation, not perfect. There will be some residual pain, but we're going to prolong the cuffs, elongate the cuffs to diminish the pain in a way that's consistent with our security needs. So that's already been fully examined in the record as it currently stands. Well, Your Honor, all we have is Mr. Sosa saying that taking me out of the very severe handcuffs is a godsend, I think was his comment on the record. We do not have really any evidence other than the affidavit that we submitted that the rear cuffing still causes pain, and we also have medical testimony that that's because his shoulders don't go there. So I don't think that the holding of this court should be that it's okay, without any analysis of the degree of pain he's suffering, whether it's gotten worse at this point. I mean, it's a progressive disease. It's enough on the record that we have now that that's sufficient. I mean, it's not one day that this happens. It could happen every day. It limits his ability to leave his cell and increases his solitary confinement. So that's the problem. It's something that is all-encompassing. It's a way of life. It's not one day or one minute. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, would the first counsel for the appellees please come to the podium and introduce herself on the record to begin? Good morning. I'm Pam Eaton. I'm here today for appellees Radigan, Hamid, and Vieira for the limited time period of October 2015 through June of 2018, as that's the time frame in which the Massachusetts Partnership of Correctional Health Care held the contract in Massachusetts. Health care is best understood when there's a collaboration between the patient and their provider. And in this case, Mr. Sosa has been arguing that our providers did not understand that he was in pain and that he had severe osteoarthritis, and therefore they were deliberately indifferent to his medical needs. But that is not the argument we've been making. The record in this case shows that my clients were very aware of Mr. Sosa's complaints of pain and that they acted to help alleviate those concerns for Mr. Sosa. Just based on my limited time today, I was planning on ---- Counsel, let me share with you an impression I got from reading your brief. It's sort of a situation where you've got the three or four people involved, and they're saying, well, it wasn't my decision to make. It was that person's decision to make. And I relied on that person, so I'm not implicated in any constitutional issue here. And the other person said, well, it wasn't really my responsibility. It was somebody else's responsibility. I mean, it seems like everybody's pointing the finger at somebody else and saying, well, it was really their responsibility, not mine. That's troubling when nobody seems to accept responsibility for the decisions that were made here. Why is ---- let's just talk about the cuffing, if you will. Why is that an unfair reaction to what I was reading in both the briefing and the statements in support of it? Yes, thank you, Your Honor. I think what happens in a correctional system is there's a collaborative approach to the medical care among the providers. So, for instance, Radigan was the HSA, or the Health Services Administrator, of the facility. So her role was to take the concerns of Mr. Sosa and then share them with the provider and help arrange for the care that he would need to see the provider or help provide the Department of Corrections information about the care that he was receiving. Her role wasn't to provide him care. It was to provide information to either Mr. Sosa or to the Department of Corrections or to the providers themselves. The providers here in this case, you have Vieira and Hamid, who are actively trying to provide care to Mr. Sosa. And this is where his lack of collaboration and cooperation. Well, like, for example, Hamid, there are many, many sick slips that explain his situation. And then the brief points out, well, he didn't verbally say it to her when meeting. I mean, that seems like an odd. Hamid understood, I would think, based on the paperwork that's coming, that pain from handcuffs is the problem. So it seems like in a collaborative setting, that's what the doctor would be talking to the patient about. Hamid understood that Mr. Sosa had osteoarthritis and that she was trying to understand how best to treat his osteoarthritis and the pain he was having from that as a result. His requested treatment was handcuffing, which isn't a typical or standard medical treatment. So you see Hamid responded to his concerns by referring him to an orthopedist to better understand his medical condition, referring him to physical therapy to better understand his medical condition, referring him for cortisone shots and injections to help his shoulder and provide him with some relief for the pain he's experiencing. Well, I mean, it is a medical, I mean, it seems to me that it's a common orthopedic kind of thing to say, you shouldn't engage in that activity because it's going to hurt you. And doctors say that all the time. And they write notes to kids saying you can't be in gym class because you might get hurt. You can't do that activity given whatever your problem is. I mean, that's what he's looking for from the doctor, the doctor's note that says this won't work. And it seems like there was, I guess, to build on what Judge Lopez was saying, just a lot of runaround for what seems like a straightforward request. I have osteoarthritis. It's well documented back to 2004. I'm writing you letters saying I am in dire pain, six slips telling you that. I'm looking for an accommodation. The doctor's note, now I understand the security side to that. But then there's a runaround to get the doctor's note, go see this person, go see that person. Why? Well, I think even if they're looking at Mr. Sosa, we had three experts review this case. We had an orthopedist, a pain management specialist, and a correctional medical expert. And they all indicated that there needs to be objective data for a medical practitioner to do something. And so they're looking at Mr. Sosa, and they're seeing he has well-developed muscles, which indicates he's able to exercise. They have information from the DOC that shows he is exercising in the room. They're able to have a cell-side visit with Mr. Sosa to actually visually see how he's moving. And he's verbally telling them, I can't move my arms in a certain way. But then when asked to demonstrate a wall climb, he's able to move his arms and rotate his shoulders in a way that he's saying he can't. So there's a disconnect between what he's saying and what they're actually observing. And so the providers are saying we need more information here to be able to assess whether he needs this recuffing restriction or other care for his osteoarthritis. So I think that it's a collaborative approach, and they're trying to obtain the information necessary to make the best decision. But in this case, Mr. Sosa continued to refuse those referrals for the orthopedist. He refused that treatment. He refused those opportunities. And so they were left without knowing what he needed or how it could be best addressed. When did the authorities actually adopt this rear cuffing procedure with the elongated handcuffs? It's my impression that that wasn't done until the litigation began. The court, as part of that litigation, ordered a report, and I think we have the Ellman report, which seemed to confirm what Mr. Sosa had been saying for quite some time about the restrictions he was experiencing because of the shoulder condition. And then the authorities made this adjustment to the cuffing procedures. Is that correct sort of sequentially? That is correct. The Ellman report came about during this litigation at the onset of this litigation, and then the cuffing restrictions or modifications were put in place. But even in his report, Dr. Ellman noted that more information was needed to better understand what was happening with Sosa. He suggested an MRI at that report. And one of our expert reports noted that some of the pain that he was describing probably wasn't consistent with shoulder arthritis, but maybe more consistent with carpal tunnel. So we needed more testing to understand where this pain is actually coming from. And so there is no question that our providers were trying to get that objective information and trying to send him out for that care, but that he continually refused. And even in this case, once the court was involved and once he was ordered to see the orthopedist, it took a court order for him to actually go to see the orthopedist because he refused initially. I think that was my time is up. Would the second counsel for the appellees please introduce himself on the record to begin? Good morning. May it please the court, I'm William Saltzman, and I represent appellees Hamid and Vieira with regard to the time that they worked for WellPATH, that is July 1, 2018 forward. And even though this time period is not the time period that encompasses the allegations that the plaintiff is making against my clients, there were very important things happening, which I think illustrate the difficulties that Dr. Hamid and Ms. Vieira were facing trying to help Mr. Sosa. Number one, the lower court ordered the Department of Correction to have Mr. Sosa seen by an independent orthopedic specialist, something that Drs. Hamid and Vieira wanted done for a long time, and Mr. Sosa refused. And it's interesting that the reason he gave for refusing the trip to the hospital wasn't because he'd be cuffed behind his back and he would not be able to stand being restrained for that long, but that he wouldn't go unless he could wear a security smock, that's a smock with no underwear, and Department of Correction would not do that, and mental health staff said, no, he's safe to where he is. There will be officers there. But he thwarted everyone's attempts, including the lower court's attempts, his initial attempts to get him seen. The second thing is, with regard to the conditions of confinement and his ongoing mental health treatment, he was deemed to be seriously mentally ill under a change of state law which modified the SMI definition from the Disability Law Center litigation. So he's eligible, in fact, has to go from the DDU to the Behavior Management Unit, and he refuses. In fact, he threatens that if he gets there, he's going to stab an officer. So, again, he's thwarting efforts by the system to help him and put him someplace where he can make some progress. And the third thing, well, he's continuing along the pathway of threatening, insulting, swearing at every single mental health clinician that came to his cell to see him. So this is the patient that these doctors were trying to assist. Now, I think the $64,000 question is, well, shouldn't they have just issued the recommendation for different restraints? And I think that was an extraordinarily difficult question. As my co-counsel said, Mr. Sosa's given off really mixed signals. On the one hand, he's saying he's in excruciating pain. On the other hand, he's exercising, he's fit. Dr. Hamid described how Mr. Sosa, restrained behind his back, just jumped up on the examining table when she saw him. And more importantly, he puts himself in situations where he'd be cuffed behind his back. He would fight the officers to celebrate his birthday, and of course he'd end up cuffed behind his back. So I think ultimately it was a very difficult decision, but I think it was an eminently reasonable decision. They wanted him looked at by somebody on the outside. They were not orthopedists. They needed an orthopedic person to make the determination about range of motion. They needed an orthopedist to make a determination about where his care and treatment should go, because he had osteoarthritis for a long period of time. And, you know, it was beyond their ability to formulate a treatment plan without the kind of information that Mr. Sosa was not letting them have. Counsel, isn't there arguably a difficult factual issue here about the extent to which clearly Mr. Sosa has serious mental issues? They've been displayed over time. But I think the argument is that the conditions under which he was confined for so long simply exacerbated those serious mental health issues. And so to hold it against him that he displays these dangerous tendencies when they have been aggravated by the very conditions under which he's held seems unfair. And perhaps they are legally vulnerable because the decisions they've made about how he should be treated creates the very conditions that they hold against him. And that strikes me as the kind of issue where expert testimony could be really helpful to sort of sort out this tangle. I think what we have before us through DOC's affidavit is a long history of extraordinarily bad behavior, even from the early days when he was in the DDU. In fact, he lost his first accommodation because he stabbed two correction officers to try to get their key to get into a cell of another inmate to hurt him. I mean, I don't need to reiterate every bad thing he did. It's in the record, and I know the court's aware. But his behavior in that regard was pretty consistent from the beginning through the years. And I think whether you want to characterize it as psychotic behavior or sociopathic behavior for which he had control, the problem for the clinicians is exactly the same. What do we do about Mr. Sosa? Would it be responsible just to give him a recommendation for an accommodation without the information that we as clinicians think we need and which would be very helpful to Mr. Sosa in terms of his care and treatment? If I may also just touch on the whole issue of one side pointing the finger at the other, clinical and correctional, I don't think that was the case at all. I mean, in the Snell case, the court went through the steps in the DOC's accommodation process, which is under regulations and policies, and it's pretty simple. Anyone can recommend an accommodation for an inmate. It doesn't have to be medical. It can be correctional. But the ultimate decision is security, whether they're going to grant it or grant it in part or find something else to do. So whether or not Dr. Hamid and Ms. Vieira made the recommendation, it was ultimately security's call whether to implement it. They could have said, yeah, we think he needs longer cuffs, and security could have said, yeah, okay, we don't override medical judgment, and they don't with regard to diagnosis and medical recommendations, but they make security determinations. Thank you. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the Mass. Department of Correction please introduce herself on the record? May it please the Court. Cheryl Grant for the Massachusetts Department of Correction, defendants, appellees. Here, while there are numerous legal issues and underlying issues in a big record, I would submit that there are two major premises that in some way factor into all the underlying substantive claims. One is something that's already been sort of discussed among the party, that Chase Osa is an extremely dangerous individual and raises serious safety and security concerns, whether it's in the context of the manner of cuffing, the conditions of confinement, and that that's something that it's proper for correction officials to factor in, whether it's the Eighth Amendment analysis or under the ADA claims. And then the second premises is when it comes to the matters such as medical and mental health diagnoses and treatment, the manner and means of treatment, that correction officials are entitled to rely on those opinions. And I don't think I need to reiterate, I guess, all the dangerous factors that involve Mr. Osa, but in the words of Michael Rodriguez, Osa's ultimate goal was to kill a correction officer or seriously injure a correction officer. So through his interactions with staff, he would try and find the vulnerability, a weakness, some sort of small window in which he could exploit in order to carry out his ultimate goal. So he had to take a cautious approach in his dealings and interactions with this individual, but he was by far in his 33 years the most dangerous individual he had ever dealt with in his career. And Mr. Osa himself, I would submit, agrees with these assessments. In his April 13, 2023 deposition, he testified that he's been onerous and unlike any other prisoner in the state of Massachusetts, and in his April 28 deposition testified if he feels disrespected or threatened, he's going to react and react in a heinous, violent manner with another prisoner, he'll give them an opportunity to rectify their ways, but if they don't, I'm going to take matters into my own hands. And it's certainly not just staff who are at risk potentially from Mr. Osa. As Mr. Saltzman just alluded to in the past, he actually stabbed correction officers in a plan to get keys to kill the inmate in the cell next door. Let me ask you about what seems to be the central point of Mr. Osa on the cuffing issue. Was there no other accommodation that would be available that would adequately meet the security concerns while addressing the range of motion point that he raises? No, I would submit at this point, after the Ellman report came out, then obviously there was a modification, double cuffs and then custom-made cuffs, and that the record shows that it's reached the point where any further elongation of that cuff essentially wouldn't serve any purpose. It would be too easy, for instance, for someone to slip the cuffs, go under the feet. Even Mr. Sosa's own security expert admitted that in his report, and Dr. Wickstead, his medical expert, not a security expert, but the length of chain he was suggesting was two feet, I believe, and even he said, I don't think that that would be enough for security. I think one of the important things to also keep in mind when it comes to the cuffing is that specifically we're talking about the time in particular when he's first brought out of the cell. What was the methodology to get to the double cuffs? Why was that the length that was decided? Is that documented that that was thought through and thoughtful? There was testimony at the time, Assistant Deputy Commissioner Sean Medeiros, it's in the transcripts of the underlying hearings. It was in conjunction with the preliminary injunction hearing, and there were some videos submitted under seal showing some issues with some of the then cuffing techniques that were being sought because at the time they were seeking waist chains only. And there was specific testimony about the risk of applying the waist chains before Mr. Sosa is out of the cell when he's still in the cell because it would require the officers to actually reach their hands through the wicket, the little space, into the cell. It puts them in a vulnerable position. I mean, nothing is perfect. I think it's trying to weigh what become the then known medical issues after the Ellman report with safety and security. And the record also shows that it was in the DDU when you're talking about the Department Disciplinary Unit or then it subsequently went to the, I know there's lots of acronyms, the BMU, Behavior Management Unit, that the length of time in those cuffs was typically very short periods of time. We'd go to the shower, which on the particular wing that he was in the DDU was a few feet away, so it might be a few seconds. Then those cuffs would be removed. The record shows that if there were particular medical, even before the accommodation was put in place, that if there were medical tests, for instance, and they were told that the manner of cuffing once he was out of the cell needed to be altered, then it would be changed. If he was going to agree to go out to recreation, once brought to the recreation, he was then transitioned into waist chains. So there's always with the waist chains, but that happened after removal from the cell. So I think that that is one of the important factors here. And nowhere, which I do point out in my brief, the security expert, nowhere in those papers is any specific suggestion given as to how Mr. Sosa could safely be removed from his cell, other than the method that came up with the department. It doesn't mean that maybe in the future someone could think of something, I suppose, but based on the record and the facts before them, that that was deemed sort of the limits that safety would allow for the behind-the-back cuffing when he's brought out of the cell. And as necessary, he might be transitioned to waist chains if he was going to be at some location for any period of time, which would really be consistent with anybody. I don't think whether it's single cuffs or, in this case, double cuffs, the intention isn't to keep someone in those cuffs longer than necessary. Counsel, there have been references to our decision on the request for a preliminary injunction, and we do go into great detail about the cuffing procedure. But basically, we're trying to make a decision as to whether the district court on the Eighth Amendment issue could conclude that there was no likelihood of success on the Eighth Amendment issue. And we said, yes, the district court was right to conclude that because of the way the whole cuffing procedure played out. But now we've got a different issue. Now the question is whether the district court was right to grant summary judgment. I'm talking about the cuffing issue. This is for us to figure out. But how does that, the analysis that we did on the preliminary injunction, how should that inform the way we look at the cuffing procedure now? I mean, that was a judgment about likelihood of success. That's not what we're dealing with now. Sure. Yeah, I'm not suggesting that. But I think the legal analysis and the elements of the offenses of the allegations are the same. It's an Eighth Amendment claim. So whether it's at the preliminary injunction stage or now, it's the plaintiff's burden to prove every element of the offense, which includes, you know, and one of the points of issue and emphasis, obviously, in the prior decision, which I think essentially remains the same now, is whether there was undue suffering. And the factor to weigh into that, as this court mentioned earlier, there is the penological issue in terms of safety and security, and that the record showed at the preliminary injunction stage continues to show now that that same risk exists. And, obviously, the summary judgment record ended at a certain point. I would dispute plaintiff's counsel's assertion that nothing has happened at Sousa since then. You know, it's not in this record, but certainly there are additional incident reports or disciplinary reports regarding possession of weapons and threats. So, you know, the hope of everyone at the time, and that was, I submit, what the record shows that the plan was when you get into the conditions of confinement as well, is that the hope was that Mr. Sousa would start to do better and would improve. That was the goal of everyone. I don't think anybody wanted Mr. Sousa to continue to be a danger and harm people. I would like to direct you to that confinement issue here before you're finished. You heard opposing counsel's argument that essentially the conditions were so harsh that it was self-defeating and, you know, in violation of the Eighth Amendment. What were those conditions? What was the justification for maintaining those conditions? Yeah, Mr. Sousa, when he went to the department disciplinary unit, the so-called D wing that's referenced is a particular wing in there consisting of observation cells. And I would submit that Mr. Sousa sort of testified to some of the initial reasons why he ended up going there himself. He stabbed correction officers multiple times. At one point he stabbed his attorney in open court with a weapon he had been able to somehow get to the court. He continued to get weapons on the regular tiers in the DDU. May I complete this? He got weapons, typically, he said, from other inmates who were near him there. And that is what resulted initially in him being placed on the D wing, which is more of an observation wing. And while there were definitely differences between the D wing cell and the regular cell, being obviously there was a window, not a window to the outside, whereas the regular cells did. Otherwise, the conditions were not all that different, I would submit. What do you make of Kennedy, I think his name was Kennedy's, recommendation to Rodriguez to change things and then the failure to do so in light of that recommendation? Yeah, the evidence shows there's also part of Mr. Kennedy's transcript that isn't in the record appendix. Immediately following that, sorry, I don't have the page cite, but what he said is when he first came into the facility, Kennedy, he was looking at the conditions to see if there was something that could be done. He wrote up a proposal and in his testimony, in the transcript of Mr. Kennedy, he also said that he did talk with Mike Rodriguez about that and that Mike Rodriguez, I believe the term was picked, his brain, as to whether or not that could possibly work. And then what the record shows is that Mr. Kennedy sort of floated his possible ideas to Mr. Sosa, and Mr. Sosa was adamant over and over and over again that he would refuse to go to the regular tier and he wanted to stay in the D wing cell. And then coupled that with around the same time in 2017, which Your Honor referenced earlier, there was a letter where Mr. Sosa said that he would, if you move me there, you know, I'm going to kill someone. I'm obviously summarizing, those are not his exact words. But in light of that, you know, the correction officials, and I think when you get to the conditions claim, there's only a money damages claim, so there's only three defendants in that case as well. So you have to look at the time applicable to each of them. And in light of the known danger that Mr. Sosa faced, I think that they were in a very difficult position. Where do you safely place Mr. Sosa, both for himself, for staff, and for other inmates? Mr. Sosa was potentially a danger to all. So I think it was a difficult decision when you look at the deliberate indifference standard, that there was not evidence of deliberate indifference. You know, and while the conditions has been referenced in terms of the mental health conditions, the department has had a vendor who has mental health staff, mental health professionals. And the record is clear that mental health professionals, while Mr. Sosa often refused to leave his cell, they were following his case, the assistant mental health director was meeting with him, and at no point, while Mr. Rodriguez was superintendent, was there a determination that Mr. Sosa was seriously mentally ill, as that was then defined, or that he needed to be moved off the unit because of his issues. And Dr. Berger-Hirschkowitz, which plaintiffs' counsel referenced, in his testimony as well, even he admitted that Record Appendix 422, he was specifically being asked about the long-term segregation, and when asked if it caused Sosa to suffer, he said it was a difficult question to answer. And when asked about his violence, Dr. Berger-Hirschkowitz also said that it was difficult to know whether his symptoms were from the DDU, or his placement, because they predated that, or whether it was related to that specifically, and whether or not he could safely be moved to less restrictive conditions. I would submit if the psychiatrist, the treating psychiatrist, although that was sort of talking about a time right after Mike Rodriguez, he's being superintendent, I would submit that the correction officials who were not trained mental health professionals were not deliberating differently. I see them well over my time, so unless there are additional questions, I'll rely on my briefs. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Jeffrey Wiesner again for Mr. Sosa. I just want to make something clear so it doesn't get lost in the mixture. As soon as Mr. Sosa filed this case, very soon after the preliminary injunction proceedings began, the district court ordered the DOC to stop using this knuckle-to-knuckle cuffing method. The DOC did it. That's the cuffing method that they had used on Mr. Sosa for at least ten years going back to 2009, and they did not appeal the decision at the preliminary injunction stage. It was essentially a concession by them that the security issues that they were claiming were so essential here didn't matter. They changed the cuffing method. The elongated chain was used, and they never appealed the decision claiming that security wasn't met. So to the extent, and I've argued this in our papers, to the extent that the judge ordered the DOC to stop using this cuff, the DOC didn't appeal it. They're continuing to use the elongated cuff. Pursuant to the PLRA and Judge Leip has their decision at the preliminary injunction proceeding, it assumes that there was either an ADA or an Eighth Amendment violation because he could not have done it otherwise. That implicates the entirety of Mr. Sosa's damages claims going back to 2010, where he was put in this torturous cuff for ten years that the DOC at the preliminary injunction stage, they didn't even challenge on this idea that they couldn't do it any other way. And that is basically the same circumstance with the prison cuff. The issue on preliminary injunction, how long does this cuff have to be, there was no real analysis. If you look at the transcripts, which are in the records, in the table of contents, the transcripts of the preliminary injunction proceedings, I asked over and over, just get the expert, the orthopedist, to decide how long the chain has to be. And the DOC just didn't do what they went ahead and arbitrarily had a cuff manufactured that was the same length as a double cuff. And all of the evidence that they say was in the record as far as what our expert said about cuffing, it's just not there. My expert evaluated whether he could be cuffed in the front and so rigged up an explanation of going through a door, and it turned out not to work because we didn't have the correct information about how the door worked. It turns out there isn't a latch in the door, it swings to the side, so none of it worked because no one had enough information. I continually went to the DOC, let's just sit down and figure this out. You can ultimately argue that it's too long and we can't ensure security, but let's just figure out how long it needs to be to make it so at least he's not placed in pain every single time he leaves his cell or we can assess just how much pain it is. Thank you, Your Honors. That concludes the argument in this case.